IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 20, 2004 Session

## IN RE: M.E.A. BY: ELIZABETH JOY ARGO EXUM, ET AL. v. KIMBERLY DARLENE MOODY, ET AL.

A Direct Appeal from the Juvenile Court for Madison County
No. 37-31,926    The Honorable Larry McKenzie, Judge

No. W2003-01669-COA-R3-PT - Filed February 19, 2004

This is an appeal of a termination of parental rights case. Appellant mother contends that the petitioners have no standing to bring the petition and also that the petitioners failed to prove by clear and convincing evidence the grounds for termination and that the termination was in the best interest of the child. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and HOLLY M. KIRBY, J., joined.

David W. Camp, Jackson, For Appellant, Kimberly Moody

Catherine B. Clayton, Jackson, For Appellees, Elizabeth Joy Argo Exum and James L.Exum

## OPINION

This is a termination of parental rights case. On December 13, 1999, M.E.A. (the "Child") was born to Kimberly Darlene Moody ("Moody," "Mother," or "Appellant") and her boyfriend, David Thomas Argo ("Argo," or "Father"). At the time of M.E.A.'s birth, Moody was married to Randy Thomas Moody. Randy Thomas Moody was incarcerated at the time of M.E.A.'s birth and he remained so at the time of trial. M.E.A.'s birth certificate specifically lists Argo as the father. Both Moody and Argo have a long history of arrests and other problems associated with alcohol and drug abuse.[1]

---

[1] In addition to the Carroll County arrest for DUI and child endangerment, and the March 18, 2000 public intoxication arrest, which led to Moody's enrollment in the drug and alcohol program at St. Francis (both discussed *infra*), there have been numerous complaints and arrests involving Moody and Argo. On September 24, 2000, Moody
(continued...)

Upon the birth of M.E.A., she was in the physical custody of Moody and Argo. Since Moody and Argo had no place to live or means to provide for the child, Argo's sister, Elizabeth Joy Argo Exum, and her husband, James F. Exum ("Exums," or "Appellees") helped with housing and other needs. Moody and Argo moved, with M.E.A., into a mobile home at Rolling Acres Estates in Jackson, Tennessee. Shortly thereafter, Moody's sister, Carolyn Cunningham, and her husband, David Cunningham, also moved into the trailer. When the Child was less than one month old, Moody was arrested in Carroll County, Tennessee for driving under the influence. She was also cited with child endangerment because M.E.A. was with her in the vehicle and was unrestrained. Moody appeared in court on March 3, 2000 and was convicted on both offenses. On March 18, 2000, Moody was again arrested in Carroll County for public intoxication. Moody subsequently pled guilty to the offense and paid a fine. Moody then enrolled in an inpatient drug and alcohol program at St. Francis Hospital in Memphis.

On March 30, 2000, Carolyn Cunningham filed a Sworn Petition in the Madison County Juvenile Court alleging that the then three-month-old Child was dependent, and requesting temporary custody of M.E.A. because "the mother is in detox at St. Francis Hospital for drugs and alcohol." On or about September 11, 2000, Joy Exum received a call at her home and was advised that Moody and her family had no money for food and necessities for the Child. Joy Exum bought those items and met Moody's mother, Judy Dunning, and her sister, Carolyn Cunningham, at Milan, Tennessee to give them those items. According to Joy Exum's testimony, the Child appeared to be unkempt and unclean at that meeting and Moody was not present.

On September 19, 2000, the Exums filed a Petition for Custody and obtained an emergency Order granting them temporary custody. On December 5, 2000, a full preliminary hearing was held, at which time the Madison County Juvenile Court continued custody with the Exums. On September 21, 2001, a Custody Order was entered, which continued custody with the Exums following a full adjudicatory and dispositional hearing on May 23, 2001. At the hearing, the court ordered a Permanent Parenting Plan, which was filed on September 21, 2001. The Parenting Plan allowed

---

[1](...continued)

signed a domestic assault warrant in Madison County, Tennessee against Argo. On November 10, 2000, Moody requested that the charge be dismissed, explaining that "both parties had been drinking heavily and that she [didn't] have a clear recollection of the events." On May 23, 2001, the day before she was scheduled to appear in court for a custody hearing, Moody and Argo were involved in another altercation in Madison County, which resulted in Argo pleading guilty to aggravated assault. Again, Moody signed a statement that she and Argo had been drinking heavily at the time of the incident and did not recall any threat with a knife. On March 25, 2002, Moody was arrested again in Carroll County for public intoxication at the Hitching Post and Paul's Pool Room. She failed to appear in court for this charge. On May 28, 2002, Moody was arrested in Henderson County for public intoxication. She pled guilty and paid a fine. On June 24, 2002, Moody was arrested in Carroll County for public intoxication, for which she pled guilty. A criminal warrant was issued against Moody on June 24, 2002 for assault on a Ms. Teresa Small. Moody failed to appear in court for this charge. On July 30, 2002, Moody was arrested in Henderson County on three charges: possession of a weapon while under the influence, public intoxication, and reckless endangerment for shooting a gun in the city over an inhabited area. These charges were pending at the time of the hearing in this matter.

Moody and Argo visitation with M.E.A. under the supervision of Moody's mother, Judy Dunning. The Parenting Plan also indicated that Moody and Argo were to complete the following:

1. Within 30 days of the date of the entry of the Order on the Adjudicatory and Dispositional Hearing in this case (The Order) which was heard on May 23, 2001, the Parents, David Thomas Argo and Kim Moody will begin to attend parenting classes at the Carl Perkins Center for Child Abuse and complete 40 hours of classes within 90 days after the date of the entry of The Order. They will provide the Court or CASA a certificate of attendance or other evidence of completion of this requirement.

2. David Thomas Argo and Kim Moody will contract for and begin alcohol and drug abuse weekly counseling sessions with a licensed counselor trained in this field, within 30 days from the date of the entry of The Order. They will continue to attend and participate in said sessions until the counselor decides that counseling is no longer necessary. They will provide the Court or CASA a certificate of attendance or other evidence of completion of this requirement.

3. David Thomas Argo and Kim Moody will not consume alcohol of any kind, or drugs (other than over the counter medications and properly prescribed medications) at any time.

4. Neither Parents, Mrs. Judy Dunning, nor Mr. and Mrs. Exum shall smoke or allow others to smoke in the presence of the child, or in manner [a] where the child is subjected to second hand smoke.

*                              *                              *

[12]. David Thomas Argo and Kim Moody will attend at least three AA meetings per week beginning by October 1, 2001 and provide evidence of attendance to the Court or CASA.

*                              *                              *

III.  FINANCIAL SUPPORT FOR CHILD

A.    CHILD SUPPORT PER CHILD SUPPORT GUIDELINES OR DEVIATIONS:

...The mother, Kim Moody shall pay child support to Mr. and Mrs. Exum, when she becomes employed, in the amount of 21% of her net income, beginning with the first paycheck she receives until further

-3-

order of the Court. Mrs. Moody will provide the Court with evidence of her earnings at the time she becomes employed.

On January 10, 2002, the Exums filed a "Petition for Termination of Parental Rights" (the "Petition") against Moody, Argo, and Randy Thomas Moody. The Petition reads, in relevant part, as follows:

> 29. Termination of Respondent's parental rights is sought based upon, as alternatives to one another, the following grounds which petitioners are prepared to prove by clear and convincing evidence.
>
> 30. As to KIMBERLY DARLENE MOODY;
>
> a.    Abandonment by KIMBERLY DARLENE MOODY, as defined in TCA 36-1-102, has occurred.
>
> b.    MOODY is able bodied, mentally competent and well able to secure at lease minimum wage employment and provide support for the Child. On information and belief, MOODY has been employed and is currently employed. MOODY is under a Court Order to provide support for the Child, but has willfully failed to make reasonable payments for the Child's support for more than four (4) months immediately preceding the filing of this Petition. The Child has been in the custody of the Petitioners since September 19, 2000.... MOODY has at all times since September 19, 2000, been able to provide support for the Child, but has willfully failed to do so, or in the alternative, any support provided was token support and insignificant given her means or ability to support. MOODY has willfully failed to visit said Child more than token visitations, defined as nothing more than perfunctory visitations or visitations of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the Child.
>
> c.    The Child has been removed from the home of the parent or guardian by Order of the Court for a period of six months and the conditions which led to the Child's removal, or other conditions, which in all reasonable probability would cause the Child to be

-4-

subjected to further abuse or neglect and which, therefore, pre[vent] the Child's safe return to the care of the parents or guardians, still persists; further, there is little likelihood that these conditions will be remedied at an early date so that the Child can be safely returned to the parents in the near future; and the continuation of the parent and child relationship greatly diminishes the Child's chances of early integration into a safe, stable and permanent home. In support of this allegation, Petitioners state the following:

(1) MOODY has no suitable residence available to properly care for and nurture this Child.

(2) MOODY has no employment or income of any substantial nature with which to properly support the Child and see to her daily physical and medical needs under the current circumstances.

(3) MOODY has not acquired, nor does it appear she will acquire, requisite parenting skills necessary to properly care for a young child and to provide fundamental care, which constitutes a condition which prevents safe return of the Child to her care.

(4) MOODY continues to consume and abuse alcohol and/or other drugs in violation of the Court Ordered Parenting Plan.

(5) MOODY has failed to comply with the Court Ordered Parenting Plan, in that she has not contacted or begun weekly alcohol and drug abuse counseling sessions with a licensed counselor trained in that field, within thirty days of the entry of the Order on September 21, 2001. Such counseling was to continue until the counselor decided counseling was no longer necessary. MOODY has not provided the Court or CASA a Certificate of Attendance or other evidence of completion of this requirement.

(6) MOODY has violated the Court Ordered Parenting Plan by smoking in the presence where the Child is subjected to second hand smoke.

\*            \*            \*

(8) MOODY has violated the Court Ordered Parenting Plan by failing or refusing to attend at lease three Alcoholics Anonymous meetings per week, beginning October 1, 2001 and provide evidence of attendance to the Court or CASA.

(9) MOODY'S lifestyle and living circumstances were, and continue to be such that the Child would be in a very unstable household, and would have little likelihood of living in the same household for any length of time, thereby negating any possibility that the Child can achieve any continuity in her life.

\*            \*            \*

(11) MOODY has no stable relationship with the Child's biological father, DAVID THOMAS ARGO, and the parties no longer reside in the same household, and there has been little, if any, effort on MOODY'S part to reunite with the father in an attempt to establish and maintain for any length of time, a nuclear household.

On January 10, 2002, the Exums also filed a Motion to Suspend Visitations, which asserts, *inter alia*, that Moody was still abusing alcohol, had failed to show any stability in her lifestyle, and that, if visitation was not suspended, irreparable harm would come to the Child. On January 10, 2002, an Order was entered suspending Moody and Argo's visitation with M.E.A.

On January 29, 2002, a hearing to determine eligibility for appointed counsel was held upon notice to all Defendants of their rights to be represented by appointed counsel if they were indigent. Argo did not appear at the hearing. Randy Thomas Moody did not appear because he was in prison, but he did correspond with the court in writing that the child "was not his child and that he was satisfied to allow the court to do whatever was best for the child." He did not request counsel. [2]

---

[2] On March 5, 2002, the Madison County Juvenile Court entered Orders terminating Argo and Randy Thomas Moody's parental rights and they are not parties to this appeal.

Moody appeared and requested counsel. By Order of March 25, 2002, counsel was appointed to represent Moody.

The hearing on the termination of Moody's parental rights was scheduled for June 4, 2002. Moody filed her Answer to the Petition to Terminate Parental Rights on June 3, 2002. A hearing on the merits was held over three days: June 4, 2002, August 15, 2002, and September 10, 2002. After the first witness had finished, the attorneys notified the court of the need for a Guardian Ad Litem. Proof was postponed until a Guardian Ad Litem was appointed and allowed reasonable opportunity to review the case.[3]

During the course of the trial, Joy Exum testified that it was not her intent to adopt M.E.A. At that time, counsel for Moody moved the court to dismiss the case for lack of standing pursuant to T.C.A. 36-1-113(b). The court denied the motion, which was renewed at the close of the Petitioners' proof and again at the close of all proof. On September 26, 2002, the Exums filed a Motion to Amend Pleadings, seeking to add as Petitioners either the Guardian Ad Litem or the "perspective [sic] adoptive parents," who were not named in that Motion or at the hearing. A hearing on this Motion was held on October 22, 2002. On October 25, 2002, the trial court signed an "Order on Motion to Amend Pleadings," which reads, in pertinent part, as follows:

> After review of the Motion to Amend the Pleadings, and the statements of counsel, the Court is of the opinion that the Motion should be granted.
> It is therefore, Ordered, Adjudged, and Decreed by the Court that the Motion to Amend the Pleadings be and the same [is] hereby granted. The Petitioners may add as additional Peitioners the prospective adoptive parents of [M.E.A.], and will file the appropriate pleadings to do so.
> It is further Ordered that the proof in the case is hereby reopened to all parties, as to any issue in this case with full rights of participation by the parties.
> It is further Ordered that the parties may continue their discovery efforts and that any discovery which is desired by either the Petitioners or the Respondent shall proceed as soon as possible in order not to delay the resetting of the case for additional proof.[4]

---

[3] The Order appointing the Guardian Ad Litem was filed on September 23, 2002.

[4] From our review of the record, it appears than none of the parties pursued further discovery or sought to tender more proof, pursuant to this Order.

On November 6, 2002, an "Order for Amendment of Pleadings" was entered, which added Barry Gregg and Susan Gregg as Petitioners in the case.[5]

On January 21, 2003, the trial court entered its "Findings of Fact, Conclusions of Law, and Order for Termination of Parental Rights" (the "Final Order"). The Final Order reads, in pertinent part, as follows:

**FINDINGS OF FACT**

1. This Court, after hearing proof, reviewing the exhibits and the entire file, has determined by clear and convincing evidence that the Respondent, KIMBERLY DARLENE MOODY, has:

A. Engaged in an extensive pattern of long standing alcohol abuse, resulting in several convictions for public intoxication, driving under the influence of intoxicants, and that this pattern existed prior to the filing of the Petition for custody, and has continued while the custody Petition was pending, through its completion, and has continued after the filing of the Petition for termination up through the date of the final hearing.

B. That the extent and the severity of Respondent's alcohol abuse has rendered her incapable of maintaining a parent/child relationship between her and the child, and that she is incapable of parenting the child.

C. That on at least one occasion, during a scheduled weekend visitation of Respondent with the child, she left the visitation after about one and one-half hours with the child, traveled with an unknown male to a nearby grocery store, and they purchased two twelve-packs of beer. This was verified not only by the testimony of the investigator, but was clearly shown on the video taken at the time, and admitted to by the Respondent.

D. That for a short period of time, the Respondent was provided housing, utilities, and other amenities relatively free of charge

---

[5] On November 12, 2002, Moody and her cousin, Janet Lynn Scott (who has Moody's power of attorney), along with Mrs. Scott's husband, Jeffrey Dale Scott, filed an "Intervening Petition for Adoption and Termination of Parental Rights." Paragraph 6 of this Petition reads: "...the Co-Petitioner, Kimberly Darlene Moody, the natural mother of the Child joins in this Petition for the purpose of voluntarily surrendering all parental rights to [M.E.A.] and to consent to the adoption of said child by the Petitioners pursuant to Tennessee Code Annotated §36-1-113." The Petition was signed by Moody and her signature was sworn to and subscribed. The Exums filed a trial brief in answer to the Petition filed by Moody and the Scotts. The final Order entered by the trial court on January 21, 2003 dismisses the portion of the Intervening Petition for lack of jurisdiction in the Juvenile Court to process an adoption.

-8-

through a government program, but that she was evicted from those living quarters after complaints from her neighbors over loud noise, parties at late hours of the evening, and not keeping the premises clean among other things. There was testimony that the manager went into the apartment when Respondent was present and saw 30 to 40 empty beer cans present in the apartment. That this incident took place while the Petition for termination was pending in this Court.

E. That according to the testimony from DANA WILLIAMS, Respondent's case worker at Pathways, which was unrebutted, the Respondent had smoked crack, an illegal drug, and that her drinking had increased steadily in the past five years and that the Respondent feels out of control when drinking. That when the Respondent starts drinking, she cannot stop. That the Respondent reported having voices in her head and that it was getting worse. That Respondent suffers from major depression and has a history of severe and persistent mental illness.

F. That the Respondent has Hepatitis-C, and that although she is aware that she cannot begin treatments for this condition until she stops drinking alcohol, she has failed to stop drinking and has not received her treatments.

G. That DANA WILLIAMS testified that Respondent was aware that with her physical illness she cannot take care of the child. Further, that Respondent was aware throughout the course of this proceeding that if she does not change her lifestyle, she would be cut off from her child.

H. That Respondent MOODY has not been employed since 1999, and has no foreseeable ability to become employed in the future. That MOODY has not provided any support for the child since the child was removed from her home. That MOODY'S visitations with the child prior to the filing of the termination Petition, were token visitations, and did not serve to solidify her relationship with the child. That on occasions the visitations were of a very short duration. On one of the weekend visitations, MOODY testified that she and the child's father and paternal grandmother got drunk, and that MOODY was driving the vehicle while intoxicated.

I. That MOODY has no sources of income other than money she receives from her family or friends, that she has no suitable residence available to her to properly establish a home and care for and nurture

the child. That she has no ability to properly support the child and see to the child's daily physical and/or emotional needs.

J. That MOODY has not acquired, nor does it appear that she will acquire, the requisite parenting skills necessary to properly care for a young child and to provide fundamental care, which constitutes a condition which prevents safe return of the child to her care.

K. That MOODY did not comply with the Permanent Parenting Plan by continuing alcohol and drug abuse weekly counseling sessions with a licensed counselor, that she violated the Permanent Parenting Plan by continuing to consume alcohol, and violated the Permanent Parenting Plan by failing to attend at least three Alcoholics Anonymous meetings per week.

L. That MOODY has given her full power of attorney to her cousin, JANET SCOTT, who basically takes care of MOODY, and provides for her needs.

M. That MOODY is dependent upon her family and friends for her needs, and that she has no physical or emotional ability to provide for her own needs, nor will she likely be able to acquire that ability in the foreseeable future. That JANET SCOTT, MOODY'S witness at the trial, agreed that MOODY had no ability to take care of the child and provide the child with even the minimum physical, medical, and emotional needs of the child.

N. That MOODY has continued to demonstrate that she has no stable relationship with the child's biological father, ARGO, and that their relationship has been stormy throughout the time of the child's life, and that ARGO is a confirmed alcoholic with no intentions of curbing his abuse of alcohol. That in spite of the effects that this has on her ability to convince the Court of her desire to keep her child, MOODY continues to abuse alcohol.

O. That Moody initially gave up custody of the child to her sister, because of her arrest and incarceration for driving under the influence of alcohol when the child was in the vehicle with her, unrestrained, and child endangerment and ultimate conviction for those offenses in March, 2000. That the conditions which lead to the removal of the child, and other conditions which prevent return persist, and that there is little likelihood that these conditions will be remedied at an early date, and continuation of parental rights greatly diminishes the child's

chance for early integration into a stable home. That Moody has failed to make fundamental adjustments in her lifestyle which could make a safe return of the child possible.

P.  That a change of caretakers and physical environment over to Moody is likely to have a detrimental effect on the child's emotional, psychological and medical condition.

Q.  That MOODY in her testimony and sworn statement, has admitted the following:

1.  That she is an alcoholic.
2.  That she continues to use and abuse alcohol.
3.  That she has no financial ability to care for the child and to see to the child's physical needs.
4.  That she has no income, nor does she have the ability to get income for her support or that of the child.
5.  That she knows that her Hepatitis-C condition is a serious matter, and that it is life threatening if untreated.
6.  That she knows she cannot start treatments until she has been alcohol free for at least six months. That MOODY has yet to start any treatment for this condition.
7.  That she is totally dependant upon JANET SCOTT and other family members for her support and that this will not change in the foreseeable future.
8.  That she has no transportation.
9.  That she has no home or stable place to live.
10.  That she has left a visitation session with the child after a short time and purchased alcohol for her own consumption. That she knew she was being watched at this time by an investigator, but that buying beer was "Legal".
11.  That on another visitation weekend with the child, she and the child's father and paternal grandmother got drunk and that she was driving the vehicle while intoxicated.
12.  That she has been convicted of driving under the influence of [an] intoxicant while the child was in the car with her unrestrained.

-11-

13. That it is not unusual for her to drink alcohol and drive a vehicle.

14. That she had pled guilty to child endangerment of the child.

15. That she has been in alcohol and drug rehabilitation, (28 days in rehab and 12 days in St. Francis Hospital) but that she continued to abuse alcohol thereafter.

16. That she has hallucinations and hears her baby crying in her head when she is not there.

17. That she suffers from major depression, has an inability to concentrate, and has panic attacks.

18. That MOODY stated in a court document filed in this case, under oath, that her parental rights (and those of the father) should be terminated and that such termination would be in the best interest of the child.

R. That the termination of the Respondent MOODY'S parental rights to the child is in the best interest of the child. That the foregoing Findings of Fact support this finding by clear and convincing evidence.

## CONCLUSIONS OF LAW

\*                                    \*                                    \*

10. That the proof and evidence as a whole is clear and convincing, such as would remove all doubt, and support a finding that Moody has abandoned the child, has not complied with the Permanent Parenting Plan or plan of care, has failed to remedy conditions that led to removal of the child, child abuse, and that Moody is mentally, emotionally and physically incompetent to care for the child, and that her inability to care for the child is continuing.

Moody appeals from this Final Order and raises two issues for review as stated in her brief:

1. Does a party have standing to file a petition when they are not one of the parties specifically identified and/or enumerated under T.C.A. § 36-1-113(b).

-12-

2. Can the court order the termination of parental rights when the petitioner has failed to carry the burden of proof necessary to allow the termination of said rights to take place.

Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn. R. App. P. 13(d).

## Standing

As noted above, during the course of the trial, Joy Exum testified that it was not her intent to adopt M.E.A. At that time, counsel for Moody moved the court to dismiss the case for lack of standing pursuant to T.C.A.§ 36-1-113(b). The court denied the motion, which was renewed at the close of the Petitioners' proof and again at the close of all proof.

At the time the Petition to Terminate was filed in this case, T.C.A.§ 36-1-113(b) (2001) read as follows:

> **36-1-113. Termination of parental rights.–**
>
> *                              *                              *
>
> (b) The prospective adoptive parent(s) of the child, any licensed child-placing agency having custody of the child, the child's guardian ad litem, a court appointed special advocate (CASA) agency, or the department shall have standing to file a petition pursuant to this part or pursuant to title 37 to terminate parental or guardianship rights of a person alleged to be a parent or guardian of such child. The prospective adoptive parents shall have standing to request termination of parental or guardianship rights in the adoption petition filed by them pursuant to this part.[6]

---

[6] This statute has since been amended. T.C.A. §36-1-113(b) (Supp. 2003) now reads:

> The prospective adoptive parent or parents of the child, including extended family members caring for related children, any licensed child-placing agency having custody of the child, the child's guardian ad litem, a court appointed special advocate (CASA) agency, or the department shall have standing to file a petition pursuant to this part or pursuant to title 37 to terminate parental or guardianship rights of a person alleged to be a parent or guardian of such child. The prospective adoptive parents, including extended family members caring for related children, shall have standing to request termination of parental or guardianship rights in the adoption petition filed by them pursuant to this part.

-13-

Appellants contend that T.C.A. §36-1-113(b) is determinative in this case, that the Exums did not have standing to file their Petition in this case, and that the amendment to the Petition, which added the Greggs as prospective adoptive parents, was filed too late to allow proper adjudication of the issues. We disagree.

At the time of the filing of the Petition to Terminate in this case, Tenn. R. Juv. P. 39 (2001) read, in relevant part, as follows:

## RULE 39. TERMINATION OF PARENTAL RIGHTS

> **(a) Petition**. A petition to terminate the parental rights of either or both parents to a minor child may be filed by any person who has knowledge of the facts alleged or is informed and believes they are true...[7]

Tenn. R. Juv. P. 1 clearly states that the Rules of Juvenile Procedure "*shall* govern the procedure in Juvenile Court in *all* cases...involving the termination of parental rights." *Id*. (emphasis added). Rules of Juvenile Procedure, along with the Rules of Criminal Procedure, Rules of Civil Procedure, and Rules of Appellate Procedure, are promulgated by the joint action of the legislature and the Supreme Court, T.C.A. § 16-3-402 and T.C.A. § 16-3-404 (1994), and they "have the force and effect of law." *See Crosslin v. Alsup*, 594 S.W.2d 379, 380 (Tenn. 1980). Although it is well settled that "[s]tatutes which conflict with the rules must be given effect to the extent possible." *see City of Caryville v. Campbell County*, 660 S.W.2d 510, 512 (Tenn. Ct. App.1983), the ultimate objective in statutory construction is to determine legislative intent. *City of Humboldt v. Morris, 579 S.W.2d 860, 863 (Tenn. Ct. App.1978)*. To that end, this Court has held that "[c]onflicts between provisions of the Tennessee Rules of Civil Procedure and provisions of the Tennessee Code which cannot be harmoniously construed will be resolved in favor of the Tennessee Rules of Civil Procedure." *Mid-South Pavers, Inc. v. Arnco Const., Inc.*, 771 S.W.2d 420, 422 (Tenn. Ct. App. 1989); *Arnold v. City of Chattanooga*, 19 S.W.3d 779 (Tenn. Ct. App. 1999). These decisions are in accord with the provisions of T.C.A. § 16-3-406 (1994), which provides:

> **16-3-406. Laws in conflict with rules nullified.**–After such rules [those described in T.C.A. §16-3-402] shall have become effective, all laws in conflict therewith shall be of no further force or effect.

For the foregoing reasons, the conflict on the issue of standing that exists between T.C.A. § 36-1-113(b) and Tenn. R. Juv. P. 39 is properly resolved in favor of the *Tennessee Rules of Juvenile Procedure*. Consequently, the Exums had standing to file this Petition to Terminate Parental Rights regardless of the amendment to add the Greggs as prospective adoptive parents.

---

[7] Tenn. R. Juv. P. 39 has not been amended to date.

However, even if we assume, *arguendo*, that Tenn. R. Juv. P. 39 is not binding in this matter, the trial court retained jurisdiction over the case and was well within its auspices to grant the motion to amend the Petition for Termination. We have found no rule of juvenile procedure dealing with amendment to pleadings. Consequently an issue regarding amendments falls under the provision of Rule of Juvenile Procedure 1 (d) which provides:

> (d) SITUATIONS NOT COVERED BY RULES. Where no specific procedure is prescribed by these rules, the court may proceed in any lawful manner, in accordance with written local rules of court, which shall not be inconsistent with these rules or with any other applicable law.

Tenn.R.Civ.P. 15, which provides that amendments "shall be freely given when justice so requires," governs amendments in the other trial courts in this state and it appears to be the applicable law used by the juvenile judge in this instance. Rule 15.03, Tenn.R.Civ.P. provides:

> **Relation Back of Amendments.** - Whenever the claim or defense asserted in the amended pleadings arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party or the naming of the party by or against whom a claim is asserted relates back if the foregoing provision is satisfied and if, within the period provided by law for commencing an action or within 120 days after commencement of the action, the party to be brought in by amendment (1) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

We find nothing in the record to prevent the applicability of the relation back provision. Accordingly, under either Tenn.R.Juv.P. 39 or under Tenn.R.Civ.P. 15, the Petitioners had standing to petition for termination of parental rights. Appellant also argues that this amendment was filed too late to allow her sufficient opportunity to present evidence concerning the addition of the Greggs. This argument also must fail in light of the trial court's "order on Motion to Amend Pleadings," which specifically reopened discovery and proof of all parties. Having failed to take advantage of that opportunity at the trial level, Moody cannot be heard to complain on appeal.

Having determined that the Petitioners have standing to file this Petition for Termination, we now turn to Appellant's second issue which, in essence, is whether Petitioners carried the burden of proof to sustain termination of parental rights.

-15-

**Termination of Parental Rights**

T.C.A. § 36-1-113 (Supp. 2001) governs termination of parental rights and reads, in relevant part, as follows:

> (c) Termination of parental or guardianship rights must be based upon:
> (1) A finding by the court by clear and convincing evidence that the grounds for termination [of] parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

The grounds for termination of parental rights are found in T.C.A. § 36-1-113(g) (Supp. 2001):

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the following grounds:
> (1) Abandonment by the parent or guardian, as defined in §36-1-102, has occurred;[8]
> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4;
> (3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> > (i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse

---

[8] T.C.A. § 36-1-102(1) defines "Abandonment," in pertinent part, as follows:

> (1)(A) "Abandonment" means, for purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, that:
> > (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

In the instant case, the trial court terminated Moody's rights based on several grounds, including abandonment, failure to comply with the parenting plan, and present and continuing inability to care for M.E.A. We note that clear and convincing evidence of any one of these grounds is sufficient to terminate Moody's parental rights. *See* T.C.A. § 36-1-113(g).

Having reviewed the entire record in this matter, we find that Moody has taken no substantial strides since her initial arrest for DUI and child endangerment to get the help she needs in order to overcome her addiction to alcohol, nor has she made any substantial attempts to comply with the requirements outlined in the parenting plan. Additionally, Moody has been unable to procure adequate housing for herself or for her child. Moody's drunken partying resulted in her eviction from the Hillcrest Place Apartments, where she had been living virtually rent and utility free. At the time of the hearing, she was living a transient existence, staying with a boyfriend and then with some other friends. Moody was not able to say when she would be able to provide adequate and stable housing for this child. Moody also testified that she hears voices, is depressed, and has panic attacks. Although Moody is supposed to take medication to control these episodes, the record shows that, on several occasions, she has failed to take her medication (either because the pills were stolen or because she failed to make sure that she had her medications on hand). At those times, Moody testified that she drinks to control her anxiety. In addition, Moody suffers from Hepatitis-C, which she knows is a life threatening disease. Moody also has been told that she cannot begin treatment for this disease until she has been sober for at least six (6) months. At the time of this hearing, Moody had not begun treatment.

The record in this case supports the trial court's Findings of Fact as set out above. M.E.A. has been out of Moody's custody for the majority of her life. The circumstances that led to M.E.A.'s removal from Moody's custody still persist. In short, Moody's alcoholism has and continues to result in behavior (i.e. arrests, inability to find employment, inability to start treatment for Hepatitis-C, inability to manage her own affairs) that is not only detrimental to the safety and welfare of M.E.A., but also to the safety and welfare of Moody herself. The record reflects that Moody, even in the face of losing her child, has been unwilling or unable to avail herself of programs that might help her to manage her disease. Furthermore, from the record, it does not appear that Moody's situation will be remedied at any time in the foreseeable future.

Under T.C.A. § 36-1-113(g) and for the foregoing reasons, we find that the continuation of the parent and child relationship greatly diminishes M.E.A.'s chances for early integration into a safe, stable and permanent home.

The record, by clear and convincing evidence, establishes grounds for termination and establishes that termination of parental rights is in the best interest of this child. We, therefore, affirm the Orders of the juvenile court, terminating the parental rights of Kimberly Darlene Moody. Costs of this appeal are assessed to the Appellant, Kimberly Darlene Moody, and her surety.

 

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.